UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Anthony Lingle, | No. 2:22-cv-01471-KJM-JDP |
| Plaintiff, | ORDER |
| v. | |
| Centimark Corporation, et al., | |
| Defendants. | |

Plaintiff Anthony Lingle has agreed with defendant Centimark Corporation, his former employer, to settle his own claims and the claims of a proposed class of similarly situated employees. He asks the court to approve the agreement on a preliminary basis and give notice to the proposed class. As explained in this order, although Lingle has demonstrated the proposed class will likely be certified, he has not demonstrated the court "will likely be able to approve" the settlement agreement itself as "fair, reasonable, and adequate," as required by Federal Rule of Civil Procedure 23(e). For that reason, the court **denies the motion in part without prejudice to renewal**.

**I.     BACKGROUND**

The court described Lingle's allegations in a previous order. *See generally* Order (Apr. 17, 2023), ECF No. 37. A brief summary suffices for purposes of his current motion. Lingle worked for Centimark as a roofer and laborer at remote job sites from 2019 to 2021. *Id.* at

1

1. According to his complaint, Centimark violated the California Labor Code and the state's Private Attorneys General Act (PAGA) by withholding wages from him and other employees, by misreporting their wages on pay stubs and by depriving them of the full rest and meal breaks required by law, among other similar claims. *Id.* at 1–2, 5, 6, 8, 9. He is pursuing his Labor Code claims on behalf of a proposed class, while his PAGA claims are, by nature, representative. *See id.* at 2. The court previously granted Centimark's motion to dismiss some of Lingle's claims, *see id.* at 14–15, and the parties went to private mediation, *see* Stip. & Order, ECF No. 39.

The mediation was successful. It resulted in an agreement to settle Lingle's claims on behalf of the class. *See* Not. Settlement, ECF No. 40. He now asks the court to certify the proposed class and to approve the settlement on a preliminary basis under Federal Rule of Civil Procedure 23(e). *See generally* Mot. Prelim. Cert., ECF No. 43; Mem., ECF No. 43-1. Centimark does not oppose the motion.

The settlement envisions payments to two groups of employees. First, a class certified under Federal Rule of Civil Procedure Rule 23(b)(3) will include non-exempt Centimark employees other than office and administrative staff who worked in California between July 2018 and November 2023. Mem. at 3; Settlement Agreement at 2, Mot. Prelim. Cert. Ex. A, ECF No. 43-2. These proposed class members can opt out of the class and, if so, would not be bound by the settlement agreement. *See* Fed. R. Civ. P. 23(b)(3). Those who do not opt out will be bound and they would release their claims. Mem. at 6; Settlement Agreement at 3–4. Second, the same group of employees, but limited to those who worked from May 2023 to November 2023, will receive settlement funds based on Lingle's PAGA claims. Mem. at 3–4; Settlement Agreement at 7. This group will receive payment regardless of whether they opt out of the Rule 23 class. *See Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 436 & n.10 (9th Cir. 2015); Mem. at 6; Settlement Agreement at 19–20.

Class members would be compensated from a $600,000 "Gross Settlement Amount," but only after several deductions for various costs and other payments. In the first instance, the agreement allocates $140,000 to Lingle's PAGA claims. Mem. at 4; Settlement Agreement at 25. Of that $140,000, California law requires a payment of 75 percent ($105,000) to the California

Labor & Workforce and Development Agency (LWDA). *See* Cal. Lab. Code § 2699(i) (2023); Mem. at 4; Settlement Agreement at 25.[1] Next, Apex Class Action LLC, which will administer the settlement agreement, will be compensated from the settlement fund for its administration expenses. Mem. at 4; Settlement Agreement at 12–13. It has estimated these costs at $7,766.25, but the settlement agreement allocates up to $15,000 for this purpose. *See* Apex Quotation, Mot. Ex. D, ECF No. 43-2; Settlement Agreement at 21. Following these deductions, Lingle requests a $10,000 award for his role as class representative, which would be in addition to his share of the settlement fund, Mem. at 4; Settlement Agreement at 3, 26, and finally, Lingle's attorneys request $200,000 for their legal fees and $15,000 to cover their own litigation costs, *see* Mem. at 5; Settlement agreement at 26.

Following these deductions, the $255,000 remainder—plus any cost or fee awards the court does not approve—will be distributed to the class members, both those in the Rule 23 class and those entitled to a recovery under PAGA. *See* Mem. at 5–6; Settlement Agreement at 26. Funds will be allocated to class members pro rata based on the number of weeks they worked during the relevant time periods. *See* Mem. at 6–7; Settlement Agreement at 17–21, 24–25. Individual class members will receive notice of their prospective awards and may object if they believe the prospective award is based on an incorrect calculation of the number of weeks they worked. *See* Settlement Agreement at 19. The settlement administrator will then mail checks to class members. *See* Mem. at 6; Settlement Agreement at 24–25. If any checks go uncashed, the uncollected money will be paid to the Salvation Army Sacramento Metro as a *cy pres* recipient. Mem. at 6; Settlement Agreement at 28.

The settlement agreement also includes a draft notice that would be sent to members of the proposed class. *See* Draft Notice, Settlement Agreement Ex. A, ECF No. 43-2. The notice explains the terms of the settlement agreement in relatively straightforward language, including what the lawsuit is about, who is in the proposed class, the amount of the settlement, what costs

---

[1] Under a recent amendment, the share paid to the LWDA is 65 percent in actions filed on or after June 19, 2024. *See* 2024 Cal. Stat. Ch. 44, § 1 (A.B. 2288). This action was filed before that effective date. *See generally* Compl., ECF No. 1-1.

and fees will be deducted, how individual payments will be calculated, how to opt out or object and who can answer questions about the agreement.  *See generally id.*

The court heard arguments on Lingle's unopposed motion for preliminary approval of the proposed settlement on January 26, 2024.  Justin Rodriguez appeared for Lingle and the proposed class, and Paul Smith appeared for the defense.  Mins., ECF No. 45.

## II. DISCUSSION

The Federal Rules of Civil Procedure require the court's approval of any settlement agreement that would bind members of a class.  *See* Fed. R. Civ. P. 23(e).  Before approving a proposal, the court must give notice to the people who would be members of the proposed class, but only if the court first determines it "will likely be able to" both certify the class formally and conclude that the terms of the settlement are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(1)(B).  The court takes these issues in turn.

### A. Class Certification

Every proposed class must meet the four general prerequisites listed in Rule 23(a) and must fit the description of one of the three types of classes identified in Rule 23(b).

Starting with the four general prerequisites, a class must first be "so numerous that joinder of all members is impracticable."  Fed. Civ. P. 23(a)(1).  Joinder is "impracticable" when it is difficult or inconvenient.  *Smothers v. NorthStar Alarm Servs., LLC*, No. 17-00548, 2019 WL 280294, at *4 (E.D. Cal. Jan. 22, 2019) (citing *In re Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)).  Although "no fixed number . . . satisfie[s] the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not."  *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 526 (N.D. Cal. 2012).  Lingle estimates the proposed class includes more than 200 employees, *see* Mem. at 13, so the court finds the proposed class is likely to meet the first prerequisite.

Second, there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This means the "claims must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v.*

4

*Dukes*, 564 U.S. 338, 350 (2011).  The court considers "the capacity of the classwide proceeding to generate common answers" and whether "[d]issimilarities within the proposed class" will "impede the generation of common answers."  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 604 (E.D. Cal. 2015) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350) (other alterations omitted).  Lingle identifies several legal and factual issues in his request for preliminary certification, all derived from Centimark's "allegedly common policies and practices."  Mem. at 14.  He groups these issues in three categories:

- He alleges Centimark paid employees extra if they completed work more efficiently or traveled to the job site, but he alleges Centimark had a policy—contrary to California law—to exclude these extra payments from its calculation of employees' overtime pay and compensation for meal breaks, rest breaks and sick leave.  *Id.*; *see also* Second Am. Compl. ¶¶ 18–19.
- He alleges Centimark had company-wide policies not to pay employees for their time and required out-of-pocket expenses, such as for travel to job sites, work during breaks, mandatory use of personal cell phones for work and breaks that were shorter than required by law but reported as compliant.  *See* Mem. at 14; Second Am. Compl. ¶¶ 20–21.
- Finally, some of his claims are derivative of the others.  Mot. at 14.  This group includes his claims for civil penalties under state law about the required contents of wage statements and about when wages must be paid.  *See id.*; *see also* Order (Apr. 17, 2023) at 6–9 (discussing these claims).

Whether Centimark followed the policies and practices above and whether those policies violated state law are common questions, and they are likely to be what would drive this litigation forward absent a settlement agreement.  Lingle has shown the litigation is likely to turn on common issues of law and fact.

Under the third prerequisite, "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on

5

conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992), *overruled in part on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. 338). Lingle has satisfied his obligation to show his claims are typical of the proposed class. The record supports his argument that Centimark's policies were the same or similar for all members of the proposed class, and if proven, the harms to its employees were similar, if not identical, in that all proposed class members allegedly lost wages or are entitled to damages or penalties based on the same alleged meal and rest break violations, sick leave violations, uncompensated travel to job sites and personal cell phone use requirement. *See* Rodriguez Decl. ¶ 9, ECF No. 43-4 (summarizing claims and supporting evidence).

Finally, under the fourth general prerequisite, class representatives and their counsel must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In evaluating this requirement, courts consider both whether (1) "the named plaintiffs and their counsel have any conflicts of interest with other class members" and (2) "the named plaintiff and their counsel [will] prosecute the action vigorously on behalf of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. at 338). "Serious conflicts of interest can impair adequate representation by the named plaintiffs, yet leave absent class members bound to the final judgment, thereby violating due process." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018). Both Lingle and his attorneys have submitted declarations describing the work they have done to move this case toward a final resolution. *See* Lingle Decl. ¶¶ 3–11, ECF No. 43-3; Rodriguez Decl. ¶¶ 3–10, ECF No. 43-4. Lingle's attorneys also have described their extensive experience in class litigation of this type. *See* Rodriguez Decl. ¶¶ 14–19. This evidence supports the conclusion Lingle and his attorneys are likely to be adequate representatives. *See, e.g., Smothers*, 2019 WL 280294, at *6.

At least one aspect of the proposed settlement agreement, however, separates Lingle from other members of the proposed class, which could suggest he is not an adequate representative.

6

He asks the court to award him $10,000 as compensation for his efforts as class representative. *See* Mem. at 4; *see also* Lingle Decl ¶ 11. The average class member, by contrast, would receive less than $1,000 under the proposed settlement agreement. *See* Rodriguez Decl. ¶ 10. Plaintiffs who stand to receive several thousand dollars extra may have an incentive to support settlement agreements unfair to the absent class members. Large awards can for that reason "undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). The Ninth Circuit has "cautioned that awarding them should not become routine practice." *Id.* at 1164. "[I]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Id.* (alteration in original) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003)). Although the $10,000 award warrants closer scrutiny, the court cannot conclude Lingle and his attorneys are unlikely to represent the class adequately just because they propose that award; under the terms of the settlement agreement, if the court ultimately does not approve the $10,000 award, the money will return to the settlement fund and will be distributed to all members of the proposed class.

For these reasons, the court finds the proposed class will likely satisfy the four general prerequisites of Rule 23(a). The next question, as previewed above, is whether the proposed class meets the definition of one of the three types of classes listed in Rule 23(b). Lingle relies on Rule 23(b)(3). A class can be certified under Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The first part of this test—predominance—addresses "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation and internal quotation marks omitted). Claims like those in Lingle's complaint often are a good fit for class litigation because they focus on an employer's company-wide policies and

7

how those policies affected many employees in the same or a similar situation. *See, e.g.*, *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1222–24 (9th Cir. 2024); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1153–55 (9th Cir. 2016); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964–66 (9th Cir. 2013). As this court has observed in previous cases, wage and hour class actions are more likely to be certified under Rule 23(b)(3) when "the major questions in the case arise from the defendants' alleged failure to properly calculate wages and overtime, account for meal periods and rest periods, and provide reimbursements." *Alcazar v. OEI Holdings, LLC*, No. 19-01209, 2023 WL 2876833, at *6 (E.D. Cal. Apr. 10, 2023) (alterations omitted) (quoting *Smothers*, 2019 WL 280294, at *7). "That may be true even when some factual questions call for individualized evidence." *Id.* (citing *Pena v. Taylor Farms Pac.*, 305 F.R.D. 197, 213–22 (E.D. Cal. 2015), *aff'd*, 690 F. App'x 526 (9th Cir. 2017) (unpublished)). An employer's uniform policies often predominate when they apply to the entire putative class and when class members did or do the same or similar work. *See, e.g., Abdullah*, 731 F.3d at 964; *Smothers*, 2019 WL 280294, at *7.

Lingle contends common questions of law and fact predominate in this case because all class members were subject to the same policies. Mot. at 14. The court agrees based on its preliminary review of the record. The disputes that would most likely take center stage in this case concern Centimark's policies and their effects on the workers it employed in the field, including on their pay, their breaks, their uncompensated travel, their need to spend their own money on phones and their paystubs. Because all proposed class members appear to have performed similar work and were subject to the same alleged policies, these questions appear likely to predominate under the terms of Rule 23(b)(3). This is not to say that no individual issues are likely to crop up. Damages, for example, and the day-to-day practices of the individual employees likely would vary. But the court finds it unlikely such person-by-person differences would be so weighty that the broader common questions described above—such as Centimark's policies and practices and the requirements of state law—would not predominate. *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013).

After predominance, Rule 23(b)(3) requires the court to ensure class litigation is the "superior" method of resolving the case. This "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon*, 150 F.3d at 1023 (citation omitted). Rule 23 lists "non-exclusive factors" to consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *Hanlon*, 150 F.3d at 1023.

In this case, none of these factors suggests another type of litigation, another action or another venue would be superior to a class settlement in this case. No individual employee is likely to have a compelling reason to litigate individually, as all will be entitled to roughly the same award, and these awards are so small that individual litigation would probably not be possible. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Neither the parties nor the court are aware of any other similar cases in any other forum. And because the parties propose to settle this action rather than to litigate it through trial, any difficulties that might arise during a trial are irrelevant. *See id.* ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." (citation omitted)).

In sum, the court finds the proposed class could likely be certified for purposes of settlement under Rule 23(b)(3).

### B.      Fair, Adequate and Reasonable Settlement

In addition to showing a proposed class is likely to be certified, its proponents must show the agreement is likely to meet the requirements of Rule 23(e)(2). Under that part of Rule 23, the court may approve a class that binds absent class members:

> only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>   (i) the costs, risks, and delay of trial and appeal;
>
>   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
>   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>
>   (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee added these specific provisions to Rule 23 in 2018 in an effort "to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments. The Committee did not intend to "displace" any of the factors courts had used previously to decide whether proposed settlement agreements were fair, reasonable and adequate. *Id.* Accordingly, this court has kept those factors in mind as well. *See, e.g.*, *Volkswagen*, 895 F.3d at 610–11 & nn.18–19 (listing factors).

Turning back to the proposed agreement in this case, Lingle has not shown it is likely "fair, reasonable and adequate" on these terms. His motion falls short in at least four respects. A renewed motion for preliminary approval addressing these shortcomings could likely be granted, least in part, but the court cannot reach that conclusion with certainty before reviewing such a renewed motion:

**1. Arm's Length Negotiations.** Lingle has not explained what evidence will demonstrate the parties negotiated at arm's length. He and his counsel state simply, in conclusory fashion,

1  they did not collude with the defense and reached an agreement after private mediation that was
2  "adversarial and contentious, although still professional in nature." *See* Mem. at 9; Rodriguez
3  Decl. ¶ 8. "[T]he mere presence of a neutral mediator . . . is not on its own dispositive of whether
4  the end product is a fair, adequate, and reasonable settlement agreement." *In re Bluetooth*,
5  654 F.3d 935, 948 (9th Cir. 2011). In the language of Rule 23(e), the court cannot say it will
6  "likely be able to" find "the proposal was negotiated at arm's length." Fed. R. Civ. P.
7  23(e)(2)(B).

8  **2. Proposed Fee Award.** Lingle's counsel does not explain why a $200,000 fee award is
9  fair and reasonable in these circumstances. They state only that their actual fees to date are
10 $239,597.50 and offer to provide "additional information to enable a lodestar cross check."
11 Rodriguez Decl. ¶ 21. As the docket of this action shows, relatively little has happened since this
12 action was removed from state court: Lingle amended his complaint, ECF No. 16; Centimark
13 moved to dismiss, ECF No. 17; the court resolved that motion largely in Lingle's favor, ECF No.
14 35; and the parties went to mediation, ECF No. 39. The court did not issue a Rule 16 scheduling
15 order. The parties did not engage in formal discovery and litigated no discovery disputes. They
16 filed no other pretrial motions. They did not prepare for a final pretrial conference or trial. None
17 of this is to say it is clear from the record that Lingle's counsel has inflated its bills or spent too
18 much time on this matter. On the current record, the court finds it is unlikely to approve the
19 proposed fee award under Rule 23(3)(2)(C)(iii), quoted above. At the same time, however, the
20 court cannot exclude the possibility that counsel could justify the proposed award at least in part
21 in a renewed motion, and the court could grant preliminary approval with the understanding that
22 any fees not awarded would revert to the class.

23 **3. Comparison of Fees and Costs with Payments to Class Members**. Relatedly, when
24 the various proposed fees, costs and awards are added together, they yield a sum of $240,000.
25 *See id.* ¶ 10. Members of the proposed class, by contrast, would receive about $255,000
26 altogether. This court hesitates to find the proposed agreement is fair and adequate when it
27 allocates nearly as much to the attorneys, administrators and named plaintiff as it does to all of
28 the other members of the proposed class. Again, as above, the total compensation and fees could

11

be reasonable, but counsel has not demonstrated as much.  It is also possible the settlement agreement could be approved based on the understanding that fees and costs would revert to the class if not approved.  But the ratio of $240,000 to $255,000 raises the possibility of a collusive agreement.  This court "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947.

**4. Adequate Compensation to Class Members**.  Finally, Lingle has not demonstrated class members will receive adequate compensation given the harms they allegedly suffered.

As explained above, the proposed agreement starts with a gross settlement fund of $600,000, and after deductions for fees, costs and payments to the state regulator, $255,000 will remain for distribution to the individual Centimark employees.  That sum is far lower than the values both Centimark and Lingle's counsel have placed on his claims at different times in this case.

When Centimark removed the case to this court, it estimated it was then facing an exposure of more than $8 million, or about $7 million if it excluded a potential award of attorneys' fees.  *See* Not. Removal ¶¶ 24–66.  For just those claims related to rest breaks, Centimark estimated more than $1.8 million was in dispute based on its own records and an economist's analysis.  *See id.* ¶¶ 32, 45–49.  If Lingle had thought his potential recovery was actually much lower or that Centimark's assumptions were faulty, he could have moved to remand the case to state court, where he chose to file it originally.  *See generally, e.g.*, *Harris v. KM Indus., Inc.*, 980 F.3d 694 (9th Cir. 2020) (affirming remand amount in controversy below $5 million).  But he did not contest Centimark's estimates or move to remand.

Even now, after further investigation and negotiations with Centimark, Lingle estimates damages are almost $6 million.  Rodriguez Decl. ¶ 10.  His attorneys also offer a "more realistic range of potential damages" that accounts for the uncertainties of litigation, such as successful defense arguments about Centimark's intent to follow the law and a jury's potential skepticism of competing evidence.  *See id.* ¶¶ 9–10.  But even that estimate is more than twice as large as the $600,000 gross settlement fund, and it is more than six times larger than the net fund that would

be available to Centimark's employees after reductions for fees, costs and other amounts. *See id.* ¶ 10.

The explanations Lingle's counsel offers for these reductions leave much to be desired. An example suffices for purposes of this order. Several of Lingle's claims rest on his allegation that Centimark did not pay employees for the many hours they were often required to spend traveling between job sites. *See, e.g.*, Second Am. Compl. ¶ 17. Based on interviews with Centimark employees, Lingle's memories of his own work, Centimark's payroll data and other similar evidence, Lingle's counsel estimated on average that employees devoted more than three hours every week—off-the-clock uncompensated hours—to mandatory travel between job sites. *See* Rodriguez Decl. at 6. This means that by Lingle's counsel's estimate, employees were entitled to more than $400,000 in unpaid minimum wages, more than $1.2 million in unpaid overtime wages and hundreds of thousands of dollars in additional penalties based on his derivative claims about inaccurate paystubs and delayed payments. *See id.* at 7–8, 11–12. Lingle's counsel argues a much smaller award was more likely for four basic reasons:

- During the summer, employees did not travel between job sites as often as they did in other seasons, so three hours might overstate the actual weekly travel time for the whole year. *Id.* at 7.
- Despite the evidence about what employees actually did in practice, Centimark had a written policy to pay employees for their travel time. *Id.* at 6–7.
- Centimark would likely argue employees spent more time traveling than was truly necessary. *See id.* at 6.
- Centimark would likely argue it did not intend to break the law or to underpay its employees, possibly citing splits of authority within the California appellate courts. *See, e.g., id.* at 11–12.

But counsel does not explain how they connected these risks to their estimates of the claims' more "realistic" value, nor whether similar defenses have proven successful in other similar cases. They have extensive experience in this type of litigation, as is clear from the declaration they submitted. *See id.* ¶¶ 14–19. But they have not connected that experience to this case and this

13

proposed agreement.  On this record, their proposed reductions could very well be mere back-of-the-envelope guesswork, even if informed guesswork.

The court understands that evidentiary and legal challenges like those above could make a full recovery uncertain or even unlikely.  It is simply unclear on this record that $255,000 would adequately compensate employees for the wrongdoing that Lingle alleges in his complaint.

### III.  CONCLUSION

Given the uncertainties above, the court declines to consider now whether the agreement to settle Lingle's PAGA claims meets the applicable requirements of state law, which resemble those in Rule 23(e).  *See, e.g.*, *Moniz v. Adecco USA, Inc.*, 72 Cal. App. 5th 56, 77 (2021) ("[A] trial court should evaluate a PAGA settlement to determine whether it is fair, reasonable, and adequate in view of PAGA's purposes to remediate present labor law violations, deter future ones, and to maximize enforcement of state labor laws.").

The court **denies** the motion for preliminary certification **without prejudice to renewal**.  Any renewed motion must be filed **within thirty days**.  Alternatively, the parties may file a further joint status report by the same deadline proposing a schedule for further negotiations, mediation or litigation.

This order resolves ECF No. 43.

IT IS SO ORDERED.

DATED: November 14, 2024.

UNITED STATES DISTRICT JUDGE